We will call case number 20-35-69 Warren v. Colonial. Counsel? Ms. Perry? Please, I mean, it's up to you. What do you want to come up with? Thank you, Judge. Good afternoon, and may it please the court. My name is Donya Perry with a law firm. Can you keep your voice up, please? Yes. The mic doesn't move, so you have to speak loud. That one does. It's the other courtroom where it doesn't move. Okay. Is that better, Judge Roth? No. No. I'll do my best. Awesome. May it please the court. My name is Donya Perry, and I'm with a law firm of Perry Guha LLP in New York City. I'm privileged to represent the appellant, George E. Warren LLC, in this matter. I did not represent my client in the proceedings before the district court. I respectfully request to reserve four minutes for rebuttal. Sure. Thank you, Your Honor. Your Honors, there's a lot of briefing in this case, and there's a large appendix, but let me get right to the point. There's a lot that the parties agree upon, and there's also a lot that the defendants completely ignore in their reply brief. But the one important point of agreement I would submit is that the conduct here, the in-line blending of butane by this Kalman carrier and its affiliate into its customer's gasoline is simply not jurisdictional conduct. This means something. It has to mean something. It means generally that the conduct is not covered by the relevant tariff and that the regulator here, this is the FERC, does not have jurisdiction. But Keogh in the Supreme Court approved a remedy against both companies and individuals who are not regulated parties. The Supreme Court has not limited the file rate doctrine thus. That is true, Your Honor. Typically this is the case, and I do want to acknowledge that there are some limited exceptions and that the defendants here have argued that in point of fact, although the tariff is not implicated and although the regulator does not have jurisdiction, that the conduct here, they would argue, or that rather that my client, the shipper, is seeking to enlarge its rights, that it does have under the tariff. I think this is... Didn't your client get what it paid for in essence? Yes, Your Honor, and that is another point of agreement. We all agree that there were certain specifications that are in the tariff and that the product that it received at New York Harbor was within those specifications. That is absolutely true. But that is really nothing to do with what we are here for. The tariff says one thing. It says you deserve on spec product. Right. But what is outside of the tariff is the tortious conduct that we are alleging in this case. Well, maybe the speculations need to be changed. You know, what can you ship? But until then, different companies ship gas with different characteristics, ship gas of, say, specification A with more or less butane in it, just as Wallace does. And until the specifications are changed to consider that, how can we... The court certainly isn't in a position to create a new specification. And isn't that what you're asking us to do? Not at all, Your Honor. But thank you for the question because there's an important distinction. Yes, shippers and manufacturers can place into a pipeline certain products that contain... It's within a specification, but there could be characteristics that are slightly different. It could be a higher level of butane or the like or other blend stock. But here it is the carrier who is itself intentionally putting that product into the pipeline. And that is not permitted within the tariff. Where is it not permitted? Well, they haven't pointed to anywhere where it is permitted. All that they do point to time and time again is item 30A in the tariff, which does not say that they're entitled to do this, and it does not say... Does it say that they're not entitled to do this? It says, Your Honor, that it is inherent in the operations of the product pipeline that natural and organic interface mixes will occur between the batches. And therefore, you don't get the same molecules necessarily that you placed into the pipeline that you then get out of the pipeline. You have to get out what is specified, and TEW is getting out what is specified. That is correct. But within that broad specification, there are different qualities. And here, the quality that it's getting is deteriorated. It's been altered. But do you have any... You say the quality of your gasoline is diminished, but can you point us to any evidence in the record about the quality of your gasoline before it enters the pipeline? I did not see anything that it had this octane or this level of butane or anything else specifically when it went in. Yes, Your Honor. There is plenty of evidence in the record. There have been expert testimony in this case. There have been studies, sampling studies and the like. Point me to the clearest evidence you have of what the quality of the gasoline was when it went in. Your Honor... What the blend margin was at the time it was delivered to the pipeline, for example. There were some tracing studies, and I will point them to you, Your Honor, directly. This was not something that the defendants raised in their brief, but I can tell you broad... And I will absolutely get that citation for you. But in broad strokes, the defendants admit, as they must, that the chemical composition was altered. They captured, to use their euphemism, a lot of the blend margin. And the blend margin or the levels in the gasoline on the northeast end of the pipeline was diminished by up to 80% in blend margin. And we, in point of fact, my client has lost millions and millions of dollars, and the defendants have made millions. I understand, but for a CARMAC Act claim or a conversion claim, sorry, a CARMAC Act claim or, you know, we need to have a baseline against which to measure the damages. And so maybe you don't have it now, maybe you get it to me on rebuttal, but I want to understand where in the record that baseline is, the prima facie case, about what the blend margin was going in. Yes, Your Honor. Because I thought you had said that your client had admitted to trying to blend up to the maximum for all that it shipped. You know, and if it said that, that would seem to suggest it may already have been at the maximum when it went into the pipeline. No, Your Honor, that is a misstatement in the defendant's briefing. And as we pointed out in our reply, that is not the point, I believe, just to one statement made by the CFO of my client in a deposition. He submitted a declaration that said, in fact, that is not the testimony that he, this is at page five of our reply brief, and that points to the citation within the record here. But our CFO testified, in fact, that it would require an expert to determine the exact levels, and he specifically made very clear that it is flat out false to characterize his testimony as saying that there was no blend margin at the high end of the pipeline. So that's just not true. But, Your Honor, to take the broader point, there is plenty of record evidence, there is expert testimony, and that is actually a question of fact, exactly how much blend margin there was at the Gulf Coast end of the pipeline and how much was out on the New York end in the harbor. Wasn't it obvious when Colonial applied for the amendment to footnote nine, which allowed for the pricing of product which entered the pipeline other than at a regular entry point, what Colonial was up to, and did GEW at that point make any complaint? I noticed that there was, Costco made a complaint to the amendment which was irrelevant, but why didn't GEW come in at that point and say, look, they're up to something. It's clear when they have product that doesn't enter at an entry point that somehow they're creating product in the pipeline, and GEW should have known what was going on and come in and objected, but they didn't. Your Honor, that was a bit of a red herring. There is excess at times in the pipeline that has nothing to do with, in fact, this is the only case where there is a manufacturer, I'm sorry, the carrier itself, injecting that excess or causing that excess to be produced on the pipeline, and in that case that Your Honor is referencing, Colonial specifically did not tell FERC and did not mention that they themselves were the cause of that excess on the pipeline. So that proceeding and the reason why Costco objected was because they were a new shipper and felt that they were being discriminated against vis-a-vis regular shippers. It just had to do with, as Your Honor pointed out, the point of origin. But that is not something, my client does not buy swell off of the pipeline, so it really had no interest in those proceedings and was not made aware by the proceedings that this swell was the product of Colonial's own intentional causing of that swell to occur on the pipeline. Counsel, could I ask you a question? I'll also ask your opposing, your friends on the other side. What rule do you think should cover whether the five white doctrine bars, specifically our request for injunctive relief? Do you think our standards for injunctive or forward-looking relief ought to be different from our standards for damages? Your Honor, certainly there is some case law that does distinguish between those two requests for relief. And to the extent that the court is concerned about the nondiscrimination prong of the filed relief doctrine, that, of course, does correct for that. It solves for that because then you don't have to worry about price discrimination. It's an across-the-board solve. And here it would certainly be very easy to do because all that Colonial has to do is turn off that valve. My question is, what rule of law do you want us to adopt? What rule of law do you think the authorities support for, let's talk specifically about injunctive relief now? When should we, when should the filed right doctrine bar such a request? I mean, as a broader matter, I don't, I mean, I don't think we're in that universe here. So it's hard to say as a broader matter, you know, how it should apply. I would say in this case in particular, I think that we have stated a case. Do you have a rule of law to suggest to us on the damages issue? Do you have any rule of law other than your client wins? Perhaps I'm misunderstanding, Your Honors. I'd just like to know how we should write the opinion. What is it that you suggest that we write the opinion to say? On damages, the filed right doctrine does X, and injunctive relief does Y. Have you thought about what we say other than George Warren wins? Your Honor, in this case, of course, we've been pressing the court to make a finding that the filed right doctrine does not apply here, simply because this is not jurisdictional conduct, that FERC has no authority here, that the tariff is not implicated, and that the rights that my client has are not being enlarged. So we would argue the normal rules sort of of the claims that we have alleged, you know, tortious interference, conversion, and the like, will apply, and a jury will have to make that determination. So your position seems to be whenever something is non-jurisdictional conduct, it shouldn't apply. Whereas, you know, in McCarran, we seem to suggest that both, you know, that we have the – I mean, you conceded earlier that there's some non-jurisdictional conduct that's covered, though. So I don't know how we draw that line. I actually, perhaps, got a little over my skis. I don't – typically, non-jurisdictional conduct does not implicate the filed right doctrine. It just – it's a truism. It's almost self-defining. The – so – but it could be. I think – I mean, the defendants have not pointed to any cases that I have seen where we are outside of the four corners of the tariff, and yet the filed right doctrine still applies. There just is not such a case. Now, the case law sometimes gets a little muddled, and so the jurisprudence can be a little all over the place, where there's some confusion between what the non-justiciability prong is and what the non-discrimination prong is, and when and what – and they do and do not apply. But I would argue as a general matter, and I think the case law absolutely bears it out, and perhaps the defendants will get up here and point you specifically to a case where it doesn't, but that is what that means. If something is non-jurisdictional, then the filed right doctrine does not apply. I did not read McCrae as saying this reaches non-jurisdictional conduct where the non-discrimination prong is invoked. Do you think it has to satisfy either non-discrimination or non-jurisdictional? Because I thought I read McCrae as saying the filed right doctrine can reach non-jurisdictional conduct if it implicates discrimination, and it could reach jurisdictional conduct even if there's no discrimination. But you seem to understand those two principles to work together differently, maybe conjunctive rather than disjunctive. Can you say anything about how you read McCrae on that? No, Your Honor. It's certainly the case that if either prong is satisfied, then the filed right doctrine comes into play. In McCrae, the court found that this certainly did implicate the tariff itself, and so it's not outside of the tariff. I mean, it's only, I think the finding was simply that filed right doctrine applies because this was jurisdictional conduct. So I think they really are largely coterminous. And again, I don't see a case, and I don't think McCrae stands for this, that where you have conduct that is clearly non-jurisdictional where one of the prongs are found to apply. And I mean, in most of the cases, what's odd about this case, which is kind of typically a gift for a plaintiff, is where here you have the defendants who concede and, in fact, have argued for years or take advantage of the fact that this conduct is non-jurisdictional. And you have a finding from FERC. You don't usually have the regulator weighing in and agreeing, yes, this is non-jurisdictional. Usually that is the very matter that's in contest, and that's for the court to decide. Here we already have that, and that's the baseline, and that's the place from where we're walking. So again, it may be that there are some cases that I'm not aware of and that defendants can point us to, and I can come back on rebuttal and perhaps be more specific. But I think what I'm struggling with is I don't know that case. I have another question, too. The red light doesn't necessarily mean anything. What is being put in and what is being taken out by GEW meets the specifications of what can be put in and taken out. And those are part of the filed rate, right, the specifications of what goes through. Now, what seems apparent to me is that those specifications aren't particular enough and that the specifications perhaps should include a blend margin or a factor reflecting the blend margin, and that if GEW could go to FERC and say we are, that Colonial has found this little loophole and they're making a lot of money off us and we need to correct the specifications of what goes in and what comes out to reflect the blend margin of the gas going in. Will FERC listen to them and consider changing the specifications? FERC has already weighed in on this question. Have they weighed in on what the specifications ought to be should they include blend margin? So that has not come before FERC. I think for the simple reason that it's not a FERC. I mean, FERC has already said that this is not something that is within their purview. Specifications are something within FERC's jurisdiction. And you are saying that Colonial is changing the character of the gas in such a way that it still meets the specifications, but it injures us. Now, isn't that an argument to say the specifications are wrong? The specifications need to include a factor to reflect the blend margin. If you want to say that, can you get to FERC to say that? Will they listen to you? We don't take issue with the specifications. What you're getting out meets the specifications. It does, Your Honor, and the reason why there's some room within the specification and it's laid out in the tariff is there can be natural changes on the pipeline that can change, in some small ways, the character of the gasoline on the pipeline. That's not what happened here. What happened here is not what's contemplated. I realize, I realize, but they are changing the nature of the gas. Yes, Your Honor. And should that change in nature be reflected in the specifications to prevent that change in nature? I think that this is an intentional tort. I don't care if it's intentional or not. I'm just talking about. That's not in the tariff, though. But should it be in the tariff? I mean, if it should be in the tariff, can GEW go to FERC and say, look, this needs to be included? I don't think that's something that the shipper can request a change in the specifications or in the tariff. I think when a change is made or proposed, that the shippers can weigh in and can object. But I'm not a regulatory lawyer, and I did not represent the client in the proceedings below. But that's not, there's nothing in the record to indicate that. And typically when a plaintiff is injured and there's nothing within the four corners of the tariff to address that type of injury, they can take advantage of a judicial forum. And that's in all the cases that we cited. And that's why we're here. It has an easy remedy, too. They can put their own butane in before they put the gas in the pipeline. They are not, they have been doing for many decades. Maybe if they do it at the beginning instead of at the end, they won't suffer any injury. For many decades or generations, they have been blending, and they have facilities that they put a tremendous amount of money into in the Newark Harbor. And that's where they do their blending. And so I, you know, we are where we are, but the client has been doing this blending. It's a large source of their revenue. They've been doing it for a long time. And they all of a sudden, the money that their profits are being taken out of their pockets and put into the pockets of the carrier here to whom they've entrusted their gasoline. And they're doing something again, and I'm sorry if I'm belaboring this point, but they're doing something that's intentionally harming and altering the quality and the value of the gasoline that is entrusted to them. No shipper could do what Colonial is doing. It is not allowed. And they are only doing it, they have control. They can turn a valve off and on to allow butane, which is a much lower quality gasoline product, into the pipeline. And that's really why we're here. They're doing something that no one else can do that is altering the quality of the product. But not altering it in such a way that it doesn't meet the specifications provided by FERC. That is correct, Your Honor. And that's why we're not in front of FERC. Had they changed the specifications or had they not met the specifications, this would be a FERC matter. We would just say, look, you're not doing this, and there are remedies within the four corners of the tariff for that. What we're talking about is within the specification, there's quite some berth for the changing of the product. And it's a much lower quality, and that is because of what Colonial has been doing en route, that it has no permission to do that is making money off the backs of their shippers without permission or authorization or compensation. Thank you. We'll see you on rebuttal. Thank you, Your Honors. Thank you. Good afternoon, counsel. Good afternoon. May it please the Court, I'm Jennifer Quinn Barabanov. I represent the Colonial Pipeline Company. I will be addressing the filed rate doctrine issues that relate to both of the Appleys and Mr. Palombas, Counsel for Powder Springs Logistics, will address any issues unique to his client. In 2018, in the biodiesel blending order, FERC held that a shipper that chooses to ship its product on the Colonial Pipeline in a fungible batch is entitled to receive product that is on specification, only that, nothing more. A shipper is not entitled to receive products with characteristics that it may prefer that differ from that specification. Okay. So as a matter of federal regulatory law, that is correct. This is strange because it falls between the stools of two bodies of law, federal regulation that preempts certain kinds of other suits, but then there's still an underlying state property right here. If a third party were to come in and siphon off the gas, you could just sue them in state court for taking this. It wouldn't have anything to do with FERC. The property right in the gas still remains in warrant. Your client disclaims taking a property interest. You're a carrier. So the problem I have here is that the claims that they're making are, you know, property-based claims like tort, et cetera, that aren't the kinds of things that are anticipated by the tariff, discussed either way in the tariff. You know, why should we read the federal preemption so broadly that it goes beyond protecting, you know, FERC's ability to set what the actual rates are and to set the specs, and all of that is being followed and they're not getting any refunds. But on the other hand, your client is profiteering in some ways that violate state law, is in cahoots with Powder Springs. So why shouldn't they be able to sue over that? Your Honor, GEW tenders product for shipment on the pipeline, recognizing that under the tariff, its reversionary interest is only to receive product of the same amount that it tendered and on the same specification. If someone came along, a third party came and tapped the pipeline and stole gas from the pipeline, it would not be your property interest. You wouldn't be able to sue them for theft of the gas. Would you disclaim taking any property in the gas? That conduct is not regulated by the tariff. The transportation of gasoline is regulated by the tariff. We take issue with the notion that they own blend margin. Blend margin is an opportunity. In the industry, it's called giveaway. But you just conceded that the tariff does not give, you don't have a property right in the gas. And so if anyone is to sue them for theft of the gas, it's going to be GEW because GEW still has property in the gas. Your Honor, there are probably multiple entities that would have a right to some sort of action there, including Colonial. It would not be you and it would not be Powder Springs. No, I think Colonial probably would have a right if someone tapped into its pipeline to see some sort of remedy. Okay, you can sue about the damage to the pipeline, but you don't own the gas. But what GEW is trying to assert here is a right to particular barrels of gasoline with a particular quantity of blend margin. And in the biodiesel order, FERC said that that is inconsistent with the tariff. Murphy Oil, a company that just like GEW, was engaged in post-delivery blending, objected to the proposed modification of the specification in that case to permit the addition of biodiesel. And the court, I'm sorry, FERC in that case said that they had no right to receive anything other than the requisite quantity of unspecified gasoline. Okay, I'm not getting rid of this question. Let me ask you the question I asked Ms. Perry, which is what rule do you propose we adopt that governs whether the filed rate doctrine bars a request for injunctive relief? Your Honor, we think it's the same standard that applies both to damages and to injunctions. What do you make of the language in McCrae that suggested that maybe it's different? Maybe the question is just whether this is going to change the tariff going forward. I do think Ms. Perry alluded to the idea that if it's going forward, there's not a problem with nondiscrimination. They're not getting a rebate or anything. Injunctive relief is going to benefit every shipper equally, so the nondiscrimination problem kind of falls away. There may be more challenging to articulate a nondiscrimination objection in the context of an injunction, Your Honor, but here with respect to the non-justiciability prong strand of the filed rate doctrine, there is a clear issue. The GEW is asking this court to recognize as a harm a diminution of quality within specification that does not exist under the tariff. How would district courts in joining that change the filed rate? It would not change the rate being charged to the shipper. So what's the violation of the rate if it's done on a nondiscriminatory, forward-looking basis? Please explain to me. It would change the terms of the service, Your Honor. It would change the delivery of fungible product authorized by the tariff. Nothing in the rate speaks either way to blending. It doesn't guarantee you a right to blend. It doesn't guarantee you a right to give Powder Springs a right to blend. Nothing in the tariff. You can't point to anything in the tariff that guarantees that, can you? Your Honor, we are the tariff. Answer some questions yes or no. Could you restate the question, Your Honor? Is there anything in the tariff that gives you or Powder Springs a right to blend? Yes, Your Honor, the product specification. Cite to me where in the record you think it speaks to your ability to blend. Your Honor, Item 5 of the tariff defines a fungible batch. That is the provision that says that product of a like specification may be commingled in shipment. And then in addition, there is the provision 30A, which the district court cited as well, that says that you are not entitled to the same molecules that you tender for the pipeline. So to put it very briefly, Your Honor, what GEW is asking is for this court to insert the word unblended into the service that is entitled to receive. Could part of the specifications be the blend margin? So, Your Honor, this actually raises one of the questions that you asked, Ms. Perry, that I'm very glad to have a chance to raise. Yes, GEW has the opportunity under a complaint process at FERC authorized by the ICA to challenge both the reasonableness of the rates and the service. If it has an issue with the product specification, it can raise it there. And in fact, and let me just also say that it's pretty clear in light of the biodiesel ruling how FERC would come out in response to a complaint here that their receipt of unspecification product is somehow unjust and unreasonable. So should the specifications be changed? I mean, if you were on the other side, wouldn't you say let's change the specifications? Can FERC, excuse me, there's a lot of pollen in the air. Can FERC do that? FERC can make a determination that the specifications are unjust or unreasonable and not approve them on that basis. And in fact, GEW come in now and say, excuse me, could GEW come in now and say the specifications need changing? We realize that now because of the blending that's being doing, being done, taking advantage of a lack in the specifications, and we need to have this put in so that we can get the same blend margin out of the pipeline that we put in the pipeline. Right, so a couple different things there. Yes, Your Honor, they could, FERC can, you know, make adjustments to the specifications. It can also award damages. And GEW has participated in a rate proceeding before FERC where concerns about in-line blending have been raised. And they intervened, and then they elected not to make substantive submissions. So they've had the tariff amendment about billing, they've had this rate proceeding, and then there's this backdrop of an ICA option that provide a plethora of opportunities for GEW to raise these concerns in a venue before an expert agency that can balance perhaps other shippers' competing interests about what they would like to receive. But what Colonial is offering is a service where non-jurisdictional blending is taking place, and they can do that because in the end they are giving GEW, as Judge Restrepo said, exactly what they paid for on specification gasoline. And to go back to the kind of pervasive equity points here, GEW, oh, let me address one thing that I think is extremely important. Ms. Perry said that she's not aware of any case where conduct outside the four corners of the tariff, where there was a case where the conduct challenge was outside the four corners of the tariff and the filed rate doctrine was found to apply. Respectfully, Your Honor, I can name several. One of them is the JMC decision, which you wrote, and in that case there was a challenge to supposed poor service being provided by the phone carrier, and this Court held that anything that is outside the four corners of the tariff is a supplemental entitlement, an enhanced service, or what Judge McNulty called a supplemental entitlement that is barred by the filed rate doctrine. And at bottom, that is exactly the kind of complaint that GEW is making here. They want transportation of unblended gasoline for the same rate. That's an enhanced service that violates the filed rate doctrine, Your Honor. And another thing that came up was this issue about whether GEW has, and if there's any evidence in the record about whether the product that they tendered to the system contains blend margin. The answer is no. They have pointed to the content of blend margin in the fungible stream, but they have not documented that they actually contributed that margin. And so that's one of the reasons also why the Carmack Amendment claim failed. Ms. Perry was saying she had some expert reports she was going to dig up by a rebuttal, and you're saying those expert reports relate entirely to the blend margin in the pipeline, not of what was being put in. Yes, Your Honor. Ms. Perry can discuss that when she gets up on rebuttal, whether that's her understanding. Correct, Your Honor. Thank you. Thank you very much. Good afternoon, Your Honors. May it please the Court. Robert Columbus on behalf of Powder Springs. Your Honors, I'm here to address the additional argument that GEW makes that the filed rate doctrine is inapplicable because Powder Springs is not the tariff filer. And as Judge Bevis recognized earlier, there is a plethora of case law going back to the Keogh case from 100 years ago, in which the filed rate doctrine has been applied to bar claims against unregulated entities. It's, in fact, quite routine. We've cited several cases where that's happened since, and then all the way up to the 2020 case from this Court in Leo, where the Court barred claims against an unregulated mortgage company and an unregulated insurance company. So there's really nothing in dispute around whether the filed rate doctrine can apply to unregulated entities. We think that's clear, and GEW hasn't cited any controlling authority on that point. Okay. But particularly as an unregulated entity, it doesn't seem that you have any particular rights under the tariff. Is there any reason, you know, I don't know if you can address the question Ms. Quinn Barabanov addressed about injunctive relief. Any way in which it would violate the tariff of the filed rate doctrine for GEW to go get an injunction, say Powder Springs, stop blending this? Yes, Your Honor, it would. It would have the exact same effect to get an injunction against Powder Springs as it would against Colonial, and it's to expand GEW's rights as a shipper under the tariff. Except if we grant damages, arguably that's lowering the rate just for GEW. Whereas if the district court, not us, grants an injunction, there's no discrimination. The rate being charged going forward remains the rate that's under the tariff. It's not operating as a rebate the way damages would. So then why should we apply as strictly, given the language in McCrae and some other cases that suggest that maybe it ought to be narrower and more specifically limited to the terms of the tariff, at least going forward? Your Honor, this is a specific expansion of rights under the tariff. And that is because right now, according to FERC, a shipper has the right to receive unspecified gasoline and that's it. An injunction would give a shipper the right to receive unblended unspecification gasoline. And JMC Telecom says that is exactly the situation where the filed rate doctrine applies. Because what we cannot do is to expand the service. Colonial has the right to choose exactly what service it's going to provide under the tariff and then to tell its customers, its shippers, what that service is. GEW pays a rate for the service. Right now that service is unspec gasoline. It would get more for that same rate if the court were to issue an injunction. And that's true whether the injunction is against Powder Springs or against Colonial. It expands the service. Another way of saying that you can take the cream off the top and they have no recourse. They have no recourse because they're getting what they're entitled to, Your Honor. There's no recourse against you, not you, but your client, because they can take what they want, add an additive, sell what they took, and they have no recourse. GEW has no recourse because it chose to ship in a fungible stream, which is the cheapest but also the most restrictive way to ship. GEW wants to have its cake and eat it too. It wants to ship in the cheapest way, the most restrictive way, but it wants to lift the restrictions that it agreed to in the tariff. It wants to expand them. Is there another way to ship it? There are plenty of ways to ship it. You can ship it by boat. You can ship it by train. There's a plantation pipeline that goes all the way up to Washington, D.C. There are other ways to ship it, but there are also ways within the tariff that can be shipped. The tariff contemplates segregated shipments, where a shipper can ship its own molecules in segregated shipments. I'll admit that that can be difficult to do operationally, but there are other – But wouldn't it be different for a segregated batch rather than a fungible batch? It would, Your Honor. That's the key difference, yes. So they would be entitled to bring these actions – Absolutely. – if they shipped as segregated batches. Because shippers in fungible batches have a right to receive their volume of on-spec gasoline and nothing more. You don't have to take my word for it. That's FERC saying that in the biodiesel decision. Now, you don't dispute. You're just a – you're at best a bailee here when you get the gasoline, right? You don't have any ownership rights in what's coming out of the pipeline. Colonial, I would describe, is the bailee in this situation. And we are a third party to the bailment relationship. Okay, right, right. So Colonial is acting like a carrier, like a common carrier. Yes. It's transmitting it. Common carriers don't take title to what they're shipping. Correct. And you're a third party who have a relationship with the carrier. Yes. So that – the underlying state property right remains in the shipper. It's just the shipper then is not entitled to recover for any damage in transit or whatever as long as it gets what is out on the other side. So we should understand this as a limitation on their remedies for anything that happens in the property or? It's two ways. So I want to address – make sure we're speaking about them both. One is the filed rate doctrine. We can put that to the side. The property question is something we've separately briefed and argued, and as a matter of bailment law. Right. It is undisputed. I mean, we've argued this in the district court and again here. The proposition of law is undisputed that GEW, the bailor, cannot sue a third party for when it receives back what it was entitled to receive from its bailee. That's what's happening. So as a matter of property law, if we were to go on the merits, the results is exactly the same for essentially the same reason. That might be true as a matter of conversion, but why wouldn't there be a possible remedy in unjust enrichment or tortious interference? Because there's no remedy in unjust enrichment because there are express agreements that govern these shipments. And they don't have to be express agreements between PSL and GEW. There just need to be express agreements. So that's the unjust enrichment piece. The tortious interference piece is just an attempt to create a tort right when GEW has agreed to take on spec product. And by the way, your honors, it's agreed not only in the tariff, but for a substantial amount of the product that GEW takes. That amount is sealed, so I won't state it here. It is a substantial amount. There's additional supply contracts that GEW enters into that says it will be supplied with on spec product. So what GEW is trying to do is say, I have an expectation of receiving blend margin, of receiving better than on spec product, even though in the tariff I've agreed to receive only on spec product, and even though in my supply agreements I've agreed to receive only on spec product. GEW got everything it was entitled to receive, and it's asking for more. It's as simple as that in this case. So if they wanted to get exactly what they put into the pipeline, there were alternatives to shipping? Yes, your honor. I just want to qualify that by saying that there are operational limitations on segregated batches. Colonial pipeline is on allocation in the sense that it's always very busy, but the tariff provides for segregated batches where GEW can ship its molecules, receive its molecules. If it does that, it pays a heck of a lot more to Colonial. GEW wants to ship in the cheapest way it can. But if they did that, they wouldn't? No blending. No blending. No blending, because the blending only occurs in the fungible batches by virtue of it being fungible, by virtue of the fact that all the shippers are getting back what they're entitled to, exactly what they're entitled to. Judge Roth, you're exactly right. If GEW wanted to address these issues, the proper place for it to do so is FERC. It could go there and it could say, we don't like the service that's being provided now that blended gasoline is being provided to us. We don't like the rates that's being charged under these conditions. FERC, you should change the tariff to add a spec for a blend margin. You should change the tariff to make this, say that this is not just and reasonable. GEW has passed on every one of those opportunities. But it could effectively get what it's looking for if it wanted to. The reason it's not doing that, Your Honors, is because we know what FERC would say, because it already said it in the biodiesel blending decision. Thank you very much, Your Honors. Your Honors, I just want to pick up where counsel just left off, which is with the biodiesel opinion by FERC, which has been discussed at some length. And I think it's pretty disingenuous for counsel to, and I don't, let me put it differently. I think it's a misstatement of what that decision by FERC said to imply that there's any equivalence between the two. Between that case and this one. There were two issues at bar, so to speak, in that case. One was there were some changes within the EPA benchmarks for fuel blending. And so the, so Colonial came forward with some changes to its product specifications with respect to biodiesel. So it made some changes, it was proposing some changes to the tariff there, to the product specifications. So two questions were before FERC there. First, was this kind of in-line blending with respect to biodiesel? So as to the first question, FERC said, no, this is not jurisdictional. And that was a point and an argument that was pressed actually by Colonial. And FERC agreed, this is not jurisdictional. So to the extent that counsel is arguing that we could have gone forward in front of FERC, they have at least twice already found that this kind of behavior is, this conduct is non-jurisdictional. And the other is that Swell case that Judge Roth, that you referred to, where it was just called non-jurisdictional conduct. But with respect to that, you know, the take that FERC had with respect to the product specifications, there are so many differences that they just, you cannot, it really is apples and oranges. There, there was, first of all, there was a requirement to change the product specifications because of some changes in the law. But secondly, this was an optional non-jurisdictional service that was being offered to shippers. And shippers were either taking it or not taking it. And they were sharing in the benefits and in the revenue. So that's not this case. And there was no opportunity in either of the cases that counsel has mentioned before FERC for my client to go in front of FERC. And they understood that they couldn't go to FERC because FERC has definitively said this is non-jurisdictional. That's why we're here. If this had been something in front of FERC, if there had been a change to the product specifications, no doubt we would be in front of FERC. That's not where we are. What we're talking about is extra-jurisdictional and non-jurisdictional conduct that has harmed my client and that can only be addressed in a judicial form rather than in a regulatory one. But aren't you also talking about specifications? No, Your Honor. We are not. Because you're saying we're unhappy we're getting what meets specifications and yet it's inadequate, which to me seems to say that the specifications are inadequate. No, Your Honor. Within the specification, there's a range. Specifications chiseled in stone? No, Your Honor. If Colonial wished to make changes, as they did in the biodiesel case for the new change in regulation, they can go to FERC and they can make that proposal and FERC can weigh in on it. That's not what happened here. But I think what Judge Roth is saying is if the range is so broad that they're capturing a big margin, blend margin, you can either really narrow the range or you could do your own blending on the front end. Your response to the front end thing is you've built all these facilities in New Jersey, but you could have the range narrowed such that there's not this extra for them to capture. I suppose that's something that FERC could do. No one has asked them to do that. Certainly Colonial has not. But that would be FERC. That would be you. Not you, but the company that would blend on the front end as opposed to the back end is what Judge Bevis is suggesting. But this is not a specification question. And so given the teaching that we already have from FERC and the precedent from FERC, that they do not view inline blending as jurisdictional. There's no forum there. Could I pick up on something? I asked you in your opening argument about whether there was any evidence of the quality or gas going in. You said yes, there were a bunch of experts. And then both of your colleagues on the other side said no. This was about, at least Ms. Quinn Barabanov said no, the expert evidence you put in was about the quality of the gas as it was in the pipeline, not the quality of the gas going in at the point that you put it in. Now I come back to you and ask, is her characterization accurate? And what record evidence shows me specifically the quality of the gas as it went in that shows that there was still a blend margin, what specific amount of blend margin there was to capture so you could compute damages? So I will point your honor to one of our expert reports, and that's in the appendix beginning at 2852, particularly at 2894.  I believe Colonial and the manufacturers who placed the product into the pipeline would have access to the analysis of the gas that goes in, that's nominated to the pipeline. What we have access to are the changes over time, both right before the blending occurred and then right after when it is taken. You have evidence before and you don't have evidence as to what the quality was when you put it into the pipeline? When it's placed into the pipeline, I don't think it's accurate to say we put it in. There are, you know, the manufacturers put it in and we buy it. So we don't have those certificates of analysis ourselves, it's a third party. You have to infer this from what has changed over time about before and after. Right before and right after, and it went down 80% within that time frame. I know I'm out of time. If I may have one more brief moment, because Judge Bevis, you asked counsel a very direct question about where within the tariff, what speaks to, what within the tariff allows this type of blending. And she pointed you, of course, to 30A, but also to item 5, and I think that was really all that she came up with. And what item 5 is, is simply a definition for a fungible batch. And it's defined as petroleum product meeting the specification, which may be commingled with other quantities meeting the same specification. But that's not what has happened here. What has happened here is that the blend stock, which has a much lower specification, it's not of the same quality. And that's what's being put in. So they're doing something that, again, as I mentioned before, other shippers can't do. And then to your point, Judge Restrepo, about the question about fungible versus segregated batches. As I understand it, I think it's a very technical distinction, because in point of fact, the pipeline is so busy, there is no capacity essentially for segregated batches. So there really, it's a possible conceivable thing in the universe, but does not happen in practice. And so it's a distinction, I believe, without a difference. If there are no further questions, I'll take my seat. Thank you so much. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.